NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0231n.06

No. 14-1398

FILED
Mar 26, 2015
DEBORAH S. HUNT, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

DBI INVESTMENTS, LLC,

      Plaintiff-Appellant,

v.

PAUL BLAVIN,

      Defendant-Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

BEFORE:    DAUGHTREY, MOORE, and CLAY, Circuit Judges.

**CLAY, Circuit Judge.** Plaintiff DBI Investments, LLC ("Plaintiff") appeals from the order entered by the district court dismissing Plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

I.

BACKGROUND

Procedural History

Plaintiff filed the present action in Michigan state court on June 28, 2013, alleging claims arising from allegedly untimely and unilateral dissolution of a partnership, PWB Value Partners, by Defendant Paul Blavin, the principal member of the limited liability company that was the General Partner for the partnership. The partnership was dissolved in April 2009, four years

before the complaint was filed. The complaint recites counts of fraud, negligent misrepresentation, promissory estoppel, and unjust enrichment. Defendant removed the action to federal court on the basis of diversity jurisdiction on June 30, 2013.[1] Defendant then moved to dismiss Plaintiff's complaint on August 6, 2013. The district court granted Defendant's motion and dismissed the complaint on March 7, 2014. Plaintiff filed a timely notice of appeal.

## Factual History

The following statement of facts is drawn primarily from Plaintiff's complaint. Consistent with our precedent, we also draw on certain documents referenced and quoted in the complaint and central to Plaintiff's claim. *Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir. 1999) (documents are properly considered as part of the pleadings if the document "is referred to in the complaint and is central to the plaintiff's claim" (internal quotation marks omitted)). Those documents include the Limited Partnership Agreement and four Dear Partner Letters dated from January 2007 to March 2009.

### 1. The Formation and Operation of PWB Value Partners

The instant case arises from Defendant's dissolution in 2009 of a limited partnership he controlled. The partnership, called PWB Value Partners ("PWB"), served as a vehicle to manage investments by Plaintiff and other limited partners. PWB was formed by Defendant in 1995 and operated pursuant to the terms of a partnership contract, here referred to as the Limited Partnership Agreement. Defendant managed PWB through two entities that the parties agree he

---

[1] Defendant properly invoked federal diversity jurisdiction in this case. *See* 28 U.S.C. §§ 1332 and 1446. Defendant is a resident of Arizona, and Plaintiff is a Michigan limited liability company with its principal place of business in Oakland County, Michigan, satisfying § 1332(a)(1). Although the jurisdictional amount was not apparent from the face of the complaint, which alleges only damages "in excess of $25,000" in accordance with Michigan Court Rule 2.111(b)(2), Defendant's notice of removal properly asserts pursuant to § 1446(c)(2) that Plaintiff is seeking to recover losses which Plaintiff believes to be in the millions of dollars.

controlled: a limited liability company called "Preservation of Capital Management" that served as the general partner of PWB, and the investment management company "Blavin & Company, Inc." ("Blavin & Company") hired to oversee PWB's investments.

Plaintiff DBI Investments, LLC is a limited liability company that was formed by two brothers, Dan and Bruce Israel, to serve as a vehicle for them to invest in PWB Value Partners. According to the complaint, the Israels trusted Defendant based on Bruce's "close, personal" friendship with Defendant dating back many years. Plaintiff invested millions of dollars in DBI in the capacity of a limited partner from 1996 through 2007.

Under the Limited Partnership Agreement, Defendant's companies received compensation in two ways. First, Blavin & Company received management fees equal to an annual rate of one percent of each limited partner's capital account balance. Second, Preservation of Capital Management, as the general partner, received a "Performance Fee" at the end of each fiscal year if the net profits of the partnership exceeded a certain threshold amount. The threshold amount was calculated based on a rate of return tied to the one-year U.S. Treasury bill and any losses carried forward from previous years. After the threshold amount was met, PWB Value Partners received a portion of the net profits. The complaint does not provide any detail regarding Defendant's personal compensation, but asserts that "[b]etween 1996 and 2007, [Defendant] profited tremendously from his involvement in PWB Value Partners, and received significant fees and profit allocations through both Blavin & Company and Preservation of Capital Management." (R. 1-1, Complaint, PGID 12.)

Defendant espoused a philosophy of value-based investing that involved taking long-term ownership in companies identified by Defendant and his employees as strong businesses that were undervalued in the market. Over the lifetime of PWB Value Partners, Defendant's

3

investment strategy proved to be very successful and very profitable. Unsurprisingly, this success foundered in 2007 and collapsed in 2008 along with the rest of the stock market.

### 2. Dissolution of the Partnership

The complaint alleges that in early 2009, Defendant met privately with the Israels and confided in them that he intended to dissolve PWB, citing the "tough stock market conditions" and "the losses that had accumulated and would be carried forward." (R. 1-1 at 18.) Allegedly, Defendant "lamented that, without any real likelihood of receiving the Performance Fee, [he] would be working for 'peanuts,' and he was not willing to do that. Instead, [Defendant] stated that he would spend more time with his family." (*Id.*)

This meeting was shortly followed by a Dear Partner Letter dated March 2, 2009 announcing the dissolution of PWB. (*Id.* at 19.) The letter began, "I have decided to liquidate our partnership and return your capital to you," and reported that the limited partners could expect to receive ninety percent of their assets by April 10th, and the rest following completion of the final audit. (R. 5-8, March 2009 Letter, PGID 345.) Defendant wrote:

> I have enjoyed, more than I can adequately express, being your fiduciary over the past 14+ years. I am grateful for the trust and confidence that you have generously placed in me.
>
> ***
>
> Now I have concluded that I want to shift my focus from business to family and personal development. I am excited by the prospect of uninterrupted time with my family and feel blessed to have this opportunity.

(*Id.*) Plaintiff shortly thereafter received a distribution of the entirety of its remaining capital as a limited partner in PWB Value Partners.

Plaintiff now asserts in the present suit that the dissolution of PWB was the culmination of unlawful conduct by Defendant that caused it to permanently realize significant investment losses. In essence, Plaintiff complains that by dissolving the partnership and liquidating its

assets at the bottom of the market, Defendant broke his promises and demonstrated that a number of earlier representations were fraudulent or misleading.

### 3. Defendant's Alleged Representations

Plaintiff's claims for fraud, negligent misrepresentation, and promissory estoppel are based on eleven alleged representations by Defendant that fall into four principal categories: (1) representations about the circumstances in which the partnership might be dissolved; (2) representations about PWB's adherence to long term investment principles; (3) representations about the Performance Fee; and (4) representations that Defendant would exercise his duties with integrity. These representations, according to Plaintiff, were proven false or were breached when Defendant unilaterally dissolved the partnership in 2009. Additionally, Plaintiff's unjust enrichment claim asserts that Defendant "would never have received the substantial profits attributable to DBI's investments" but for his alleged misrepresentations about the performance fee and PWB's adherence to the alleged investment principles. (R. 1-1 at 35.) We summarize the four categories of representations in turn.

### a. Representations about Dissolution Provisions

The complaint suggests throughout that Defendant's dissolution of the partnership was improper, or at least contrary to his representations. The representations recited by the complaint essentially summarize the pertinent provisions of the Limited Partnership Agreement. That agreement required the dissolution of PWB upon the occurrence of any one of a number of "dissolution event[s]," including if "[t]he General Partner ceases to be a General Partner." (R. 5-2, Limited Partnership Agreement, PGID 171.) The partnership would not be subject to dissolution, however, if a majority in interest of the limited partners voted to continue the

partnership on the withdrawal of the general partner. A vote on whether to continue the partnership was required to be called by a limited partner.

Plaintiff alleges that Defendant violated these provisions by dissolving PWB without a vote. Defendant concedes that no vote was held; Plaintiff does not allege that it or any other limited partner exercised their right to call for a vote.

Some further portions of the Limited Partnership Agreement are relevant to dissolution. Significantly, the agreement empowered the general partner, Preservation of Capital Management, to withdraw from the partnership by giving notice. (*Id.* at 170-71.) Further, the Limited Partnership Agreement provided that a limited partner's membership in the Partnership terminates when its entire interest has been distributed or withdrawn. As Plaintiff concedes, the general partner possessed the right under the agreement to liquidate a limited partner's investment and distribute it to that limited partner.

### b. Representations about Defendant's Long Term Investment Principles

Five of the eleven "material representations" upon which Plaintiff founds its claims concern PWB's investment strategy prioritizing long term investment based on intrinsic value. For example, the complaint alleges "material representations" by Defendant that PWB "would strictly adhere to its stated long-term investment principles" and that Defendant "maintained an unwavering focus on long-term intrinsic value . . . rather than short term results." (R. 1-1 at 21-22.) In this regard, Plaintiff cites to and quotes from several Dear Partner letters as providing "confirmation and reiteration of PWB Value Partners' investment principles." (*Id.* at 14.) For example, the Dear Partner Letter dated January 17, 2007, contained the following statements under the heading of "General Observations:"

> I believe that we have a distinct advantage in today's environment by maintaining
> our unwavering focus on the **long-term** intrinsic value of our investments rather

than short-term trading results. We do not focus on our month-to-month or quarter-to-quarter results or dampening the volatility thereof. Instead, through disciplined, thorough analysis and concentrated, aggressive capital allocation only when compelling opportunities arise, we look to preserve and compound our capital over a five-year time horizon. This timeframe is often necessary for short-term issues to clear (often driven by sentiment and emotion) and the long-term intrinsic value to shine through.

(R. 5-5, January 2007 Letter, PGID 326 (emphasis in original).) In the same section, the letter discussed the "pressure for short-term trading profits," and also expressed gratitude for the "patience and understanding" of the partners that allowed PWB to "zig when others zag." (*Id.* at 326-27.)

The complaint also cites to letters dated January 23, 2008 and July 16, 2008 in alleging that Defendant represented that a three-to-five year timeline applied to PWB's investments. The tenor of these letters is notably affected by the market conditions then extant. The January 2008 letter sought to contextualize disappointing results from 2007 by highlighting PWB's past successes, discussing market sell-offs affecting its core holdings, and expressing confidence that, in language quoted by the complaint, "at today's market prices each [PWB] holding provides a solid margin-of-safety against permanent capital loss and has the potential for significant capital appreciation over the next three-to-five years." (R. 5-6, January 2008 Letter, PGID 334.) The letter reiterated PWB's commitment to a long term investment strategy. Similarly, the July 2008 Dear Partner Letter acknowledged the fear pervading the market, but expressed confidence that "the long-term fundamentals of [PWB's] core holdings remain solid." (R. 5-7, July 2008 Letter, PGID 342.) The letter further stated, "[b]y investing with a three-to-five year time horizon, we believe (and experience has reinforced) that our combined patience will prove a valuable advantage in these trying times." (*Id.* at 343.)

Although the complaint asserts repeatedly that Defendant made oral representations to Plaintiff about the partnership's "strict adherence" to long-term investment principles, the complaint is devoid of any information about the circumstances and dates of such statements apart from the Dear Partner Letters. For example, the complaint alleges that "Blavin personally assured and represented to the Israels that PWB Value Partners would strictly adhere to the investment principles listed above before DBI made its first investment and repeatedly through 2008, both orally and in writing." (R. 1-1 at 10.) DBI's first investment was made in 1996, so that assertion covers a period of twelve years.

### c.  Representations about the Performance Fee

All four counts of the complaint allege that Defendant made misrepresentations about the incentive structure created by the Performance Fee. The complaint alleges that Defendant represented "[t]hat the Performance Fee was in the best interests of the limited partners, including DBI," and "[t]hat the Performance Fee created a 'win-win' situation by aligning the interests of [the general partner and the limited partners] because Preservation of Capital Management would not receive any compensation unless the limited partners earned net profits in excess of the Threshold Amount." (R. 1-1 at 21, 26, and 31.) In this vein, the complaint cites to passages from Dear Partner Letters assuring Limited Partners, for example, that "[o]ur financial interests have always been aligned with yours." (R. 1-1 at 14.). In context, however, it is clear that those passages are referring not to the Performance Fee but to the fact that Defendant and his business partner kept their own funds invested alongside the limited partners' funds.

### d.  Representations that Defendant would Exercise His Duties with Integrity

The final category of alleged misrepresentations on which Plaintiff bases its claims encompasses statements by Defendant that he would perform his duties with honesty and loyalty.

Some of the specific statements alleged in the complaint are drawn directly from Dear Partner Letters, such as the alleged representation that Defendant "would conduct himself with scrupulous honesty, had his capital side by side with PWB Value Partners' limited partners, and work ever more diligently to affirm the trust of the limited partner."[2] (R. 1-1 at 22, 27, and 31.) Additionally, in some instances Defendant referred to himself as a "fiduciary" to the limited partners, for example writing on July 16, 2008, "[a]s fear envelops equity and credit markets worldwide, I believe that it is my fiduciary obligation to you to maintain a sense of rationality and discipline[.]" (R. 5-7, at 342.) The complaint alleges that these representations were false because Defendant dissolved PWB "to serve his own self-interests to the detriment of PWB Value Partners' limited partners, including DBI." (R. 1-1 at 23, 28.)

## II.

## DISCUSSION

### Standard of Review

Because "the sufficiency of a complaint is a question of law," we review *de novo* a ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 369 (6th Cir. 2011). Like the inquiry required of the district court, appellate review of a motion to dismiss "consider[s] the factual allegations in [the] complaint to determine if they plausibly suggest an entitlement to relief." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009)). Courts must accept as true the factual allegations pleaded in the complaint. *Id.* On the other hand, "conclusory recitals of the elements of a claim, including legal conclusions couched as factual allegations" need not be accepted. *Id.* This Court "may

---

[2] The January 2008 Letter stated in closing, "you can expect us to continue to conduct ourselves with scrupulous honesty, keep our capital side-by-side with yours, and work ever more diligently to affirm your trust." (R. 5-6 at 337.)

affirm the district court's dismissal of Plaintiffs' claims on any grounds, including those not relied on by the district court." *Zaluski v. United American Healthcare Corp.*, 527 F.3d 564, 570 (6th Cir. 2008).

In cases arising under diversity jurisdiction, we must apply "the substantive law of the forum state." *Conlin v. Mortg. Elec. Registration Sys. Inc.*, 714 F.3d 355, 358 (6th Cir. 2013). The present case was originally filed in Michigan state court and the parties agree that Michigan law applies. The decisions of Michigan's highest court are binding on this Court in applying Michigan law, and "[i]ntermediate state appellate courts' decisions are also viewed as persuasive." *Id.* (quoting *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008)).

## Analysis

### A. Michigan Law Regarding Fraud and Negligent Misrepresentation

Plaintiff asserts that Defendant committed fraud or at least negligent misrepresentation in making representations that Plaintiff contends were ultimately proven false when Defendant dissolved PWB in 2009. For convenience, we shall refer to the two claims as the "fraud claims." Both claims require a showing that the defendant made a statement with the knowledge or intention that the plaintiff would rely on it, and that the statement was false when made. *See Hi-Way Motor Co. v. International Harvester Co.*, 247 N.W.2d 813, 816 (Mich. 1976) (elements for fraud); *Law Offices of Lawrence J. Stockler, P.C. v. Rose*, 436 N.W.2d 70, 82 (Mich. Ct. App. 1989) (elements for negligent misrepresentation). For fraud, the plaintiff must establish that the defendant knew the statement was false or acted with reckless disregard as to the truth of the statement. *Hi-Way Motor Co.*, 247 N.W.2d at 816. For negligent representation, the plaintiff must establish that the defendant failed "'to exercise reasonable care or competence in obtaining or communicating the information.'" *Stockler*, 436 N.W.2d at 82 (quoting Restatement Second

of Torts § 552). As summarized above, the complaint seeks to premise Defendant's liability for the fraud claims on four categories of representations. None of these representations are adequate to make out a cognizable fraud claim.

## 1. Statements About Contract Provisions

Two of the categories of representations alleged in the complaint relate directly to the content or operation of provisions of the Limited Partnership Agreement. Defendant's alleged statements about the manner and circumstances in which PWB may be dissolved summarize a portion of the relevant contract provisions, and his alleged statements about the incentives created by the compensation structure relate to the operation and effect of the Performance Fee. Under Michigan law, these representations cannot sustain the fraud claims.

Generally, under Michigan law, a plaintiff "[may] not maintain an action in tort for nonperformance of a contract." *Ferrett v. Gen. Motors Corp.*, 475 N.W.2d 243, 247 (Mich. 1991). Not all tort claims, however, are barred by the existence of a contract. Rather, Michigan courts must inquire whether the legal duty allegedly violated by a defendant "arise[s] separately and distinctly from a defendant's contractual obligations." *Loweke v. Ann Arbor Ceiling & Partition Co., LLC*, 809 N.W.2d 553, 559 (Mich. 2011).

Thus, Michigan courts have allowed claims for negligence resulting in physical harm to third parties, *see id.* (allowing injured employee of electrical subcontractor to proceed with negligence claim against drywall subcontractor); or retaliatory discharge of an at-will employee contrary to public policy, *Phillips v. Butterball Farms Co.*, 531 N.W.2d 144 (Mich. 1995). In contrast, Michigan courts have rejected tort claims based on negligent performance or nonperformance of a contract resulting in only economic harm, a rule sometimes called the "economic loss doctrine." *See*, *e.g.*, *Rinaldo's Constr. Corp. v. Mich. Bell. Tel. Co.*, 559 N.W.2d

647 (Mich. 1997) (plaintiff could not allege tort for business losses incurred due to telephone company's negligence in installing and maintaining phone lines); *Neibarger v. Universal Coops., Inc.*, 486 N.W.2d 612 (Mich. 1992) (applying economic loss doctrine to disallow products liability claim where milking equipment injured cows); *Hart v. Ludwig*, 79 N.W.2d 895 (Mich. 1956) (rejecting negligence claim when the defendant had quit pruning orchard early).

Michigan courts recognize fraudulent inducement as an exception to the economic loss doctrine. *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*, 532 N.W.2d 541, 544 (Mich. Ct. App. 1995); *see also Gen. Motors Corp. v. Alumi-Bunk, Inc.*, 757 N.W.2d 859 (Mich. 2008) (endorsing a *Huron Tool* analysis of a fraud claim). The court in *Huron Tool* quoted with approval the observation that fraud in the inducement "addresses a situation where the claim is that one party was tricked into contracting" and is "based on pre-contractual conduct which is, under the law, a recognized tort." 532 N.W.2d at 544 (quoting *Williams Elec. Co. Inc. v. Honeywell, Inc.*, 772 F. Supp. 1225, 1237-38 (N.D. Fla., 1991)); *see, e.g., Llewellyn-Jones v. Metro Property Group, LLC*, 22 F. Supp.3d 760, 778-79 (E.D. Mich. 2014) (applying Michigan law) (allowing a fraud in the inducement claim to proceed notwithstanding the existence of a contract where the plaintiffs alleged a "bait-and-switch" scheme by the defendants to sell properties other than the ones shown and pictured during the transaction). Claims of fraud "extraneous to the contract" are permissible, whereas "fraud interwoven with the breach of contract" cannot support an independent claim. *Huron Tool*, 532 N.W.2d at 545.

Plaintiffs' allegations of fraud based on Defendant's representations regarding the dissolution procedure are essentially claims of nonperformance of the relevant contract provisions governing that procedure. Plaintiff does not allege any statements related to dissolution extraneous to these provisions that "tricked" it into entering the contract. *See id.* at

544. Similarly, Plaintiff's claim that Defendant misrepresented the effect of the performance compensation structure concerns the operation of a contract provision with which both parties were directly familiar. Plaintiff, an entity representing and controlled by two sophisticated businessmen, cannot claim that it was tricked into the Limited Partnership Agreement based on Defendant's emphasis on the positive aspects of the arrangement. *See id.* Nothing prevented Plaintiff in this context from foreseeing the downside as well as the upside of a performance-based compensation structure. Because the allegations of fraud based on the statements about dissolution procedures and the Performance Fee are "interwoven" with the nonperformance or foreseeable effect of contract terms, they are barred by the economic loss doctrine.

Plaintiff argues that its fraud claims are not barred by the Limited Partnership Agreement because Defendant, individually, was not a direct party to the contract. Plaintiff is correct that "corporate officials may be held personally liable for their individual tortious acts done in the course of business, regardless of whether they were acting for their personal benefit or the corporation's benefit." *Dep't of Agric. v. Appletree Mktg., L.L.C.*, 779 N.W.2d 237, 246-47 (Mich. 2010) (quoting *Livonia Bldg. Materials Co. v. Harrison Constr. Co.*, 742 N.W.2d 140, 143-44 (Mich. 2007)). Plaintiff has not produced any Michigan authority, however, that this principle trumps the economic loss doctrine. Defendant's representations about dissolution procedures and the operation of the Performance Fee were made in the course of arranging and carrying out a partnership contract between Plaintiff and entities that he controlled. In these circumstances, Plaintiff cannot avoid the economic loss doctrine merely by suing Defendant in his personal capacity.

## 2. Statements About Defendant's Investment Principles and Timeline

The representations related to Defendant's investment principles and timeline are also inadequate to make out the fraud claims under Michigan law. Claims for fraud and negligent misrepresentation, as a general rule, may not be based on representations about future conduct. *Forge v. Smith*, 580 N.W.2d 876, 884 (Mich. 1998) (negligent misrepresentation); *Hi-way Motor Co. v. Int'l Harvester Co.*, 247 N.W.2d 813, 816 (Mich. 1976) (fraud). Plaintiff's theory of fraud is that Defendant assured Plaintiff and other limited partners that PWB would hold investments over the long term in accordance with his philosophy of value-based investing, and that these assurances were proven false when Defendant liquidated PWB's investments in 2009 at the bottom of the stock market. Plaintiff particularly emphasizes statements by Defendant alluding to a three-to-five year timeline for 2007 and 2008 investments. Each of these statements plainly related to future conduct, *i.e.*, the manner in which Defendant would manage PWB's investments.

Plaintiff argues that its claims fall under one or more of the exceptions to the rule that claims of fraud may not be based on future conduct: the "bad faith" exception, the exception for intended factual representations, and the exception where there is a relationship of trust and confidence between the parties. Pl.'s Br. at 40 (citing *Rutan v. Straehly*, 286 N.W. 639, 642 (Mich. 1939); *Crook v. Ford*, 229 N.W. 587, 588 (Mich. 1930)). The bad faith exception requires a "present undisclosed intent not to perform." *Foreman v. Foreman*, 701 N.W.2d 167, 175 (Mich. Ct. App. 2005) (citing *Rutan*, 286 N.W. at 642). The complaint defeats this theory by acknowledging that Defendant did in fact perform by managing the investments of Plaintiff and other limited partners over a fourteen-year period. Any inference of bad faith is negated by Plaintiff's own allegation that Defendant took the decision to dissolve PWB based on the

unanticipated losses caused by the stock market crash. Although Plaintiff is correct that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally" under Federal Rule of Civil Procedure 9(b), a general allegation of "bad faith" cannot overcome the other pertinent factual allegations in this complaint.

Under the second exception identified by Plaintiff, statements related to future conduct may form the basis for liability "if the statements were intended to be, and were accepted, as representations of fact, and involved matters peculiarly within the knowledge of the speaker." *Crook*, 229 N.W. at 588. Defendant's alleged statements regarding his investment philosophy and timeline do not satisfy these requirements. Rather, the statements were phrased, and clearly intended, as statements of opinion. For example, the January 17, 2007 Dear Partner Letter stated "I believe that we have a distinct advantage in today's environment by maintaining our unwavering focus on the **long-term** intrinsic value of our investments rather than short-term trading results." (R. 5-5, January 2007 Letter, Page ID# 326.) This statement does no more than set out an investment professional's opinion as to why his investment strategy is sound. Nor does the complaint allege that Defendant's investment philosophy was *not* based on long-term value; rather, Plaintiff charges that Defendant's choice to dissolve the partnership was unsound under those principles. This sort of second guessing cannot convert Defendant's description of his investment philosophy into a statement of fact that can be proven false for purposes of a fraud or negligent misrepresentation claim.

Finally, Plaintiff makes a passing reference to the third exception based on Defendant's long friendship with Bruce Israel. That exception allows fraud claims based on statements about future conduct where there is "a relation of trust and confidence" between the parties. *Rutan*, 286 N.W. at 642; *see also Ainscough v. O'Shaughnessey*, 78 N.W.2d 209, 214 (Mich. 1956)

(reciting the same exception).  Plaintiff offers no authority where this exception has been applied, leaving us without meaningful guidance on its contours under Michigan law.  A relevant Restatement provision requires that in order for a statement of intent to be fraudulent, the person making that statement "must in fact not have the intention stated."  Restatement Second of Torts § 530, comment b.  The allegations in the complaint that Defendant dissolved the partnership because of the market losses in late 2008 preclude a conclusion that Defendant already planned to abandon his value-based investment strategy when he made the alleged representations in 2007 and 2008.  Because the complaint prevents an inference that Defendant did not possess the stated intention at the time he made the representations, we conclude that Plaintiff cannot succeed under this exception.

### 3.  Statements About Defendant's Intent to Perform with Integrity

Defendant's alleged representations that he would serve PWB's limited partners with "scrupulous honesty" and integrity fall squarely into the class of statements that as "mere puffery" are "not actionable for fraud."  *Sneyd v. Int'l Paper Co., Inc.*, 142 F. Supp. 2d 819, 824 (E.D. Mich. 2001) (applying Michigan law) (citing *In re Royal Appliance Sec. Litig.*, 64 F.3d 663, 1995 WL 490131 at *3 (6th Cir. 1995) (table)).  Defendant's rhetorical flourish that the Limited Partners could expect that he would conduct himself with "scrupulous honesty" or that he would work "ever more diligently to affirm [their] trust" is not the stuff of which fraud claims are made.  In the words of one of sister circuits:  "[s]oft, puffing statements such as these generally lack materiality . . . [n]o reasonable investor would rely on these statements." *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289-90 (4th Cir. 1993) (internal quotation marks omitted).

**B. Rule 9(b) Standards**

Plaintiff's fraud and negligent misrepresentation claims also fail to meet the standards set out in Federal Rule of Civil Procedure 9(b). That rule requires that complaints alleging fraud or mistake "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Rule 9(b) is not to be read in isolation, but is to be interpreted in conjunction with Federal Rule of Civil Procedure 8." *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 503 (6th Cir. 2007). "When read against the backdrop of Rule 8, it is clear that the purpose of Rule 9 is not to reintroduce formalities to pleading, but is instead to provide defendants with a more specific form of notice as to the particulars of their alleged misconduct." *Id.* Therefore, "[i]n complying with Rule 9(b), a plaintiff, at a minimum, must 'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'" *Id.* at 504 (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003) ("*Bledsoe I*")).

The present complaint plainly does not meet these requirements. According to the complaint, Defendant made the material statements on multiple, unspecified occasions dating from before Plaintiff first invested in the partnership in 1996 all the way through 2008. Contrary to Plaintiff's argument, this lack of specificity does defeat the purposes of both Rule 8 and Rule 9—neither Defendant nor the district court were given reasonable notice of what communications allegedly misled Plaintiff, rendering it difficult if not impossible to determine which of Plaintiff's investment decisions were allegedly influenced by the statements and to allow Defendant to marshal proof concerning the circumstances in which any of the statements (or at least those not directly traceable to the Dear Partner Letters) were made.

Plaintiff argues that if the complaint did not contain sufficient particularity, the matter should be remanded to allow it to file an amended complaint. Defendant argues that Plaintiff relinquished this path by failing to seek leave to amend earlier. We do not agree that the right to amend is so easily waived. We have held that "where a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice." *Bledsoe I*, 342 F.3d at 644 (remanding to allow the plaintiff an opportunity to amend, even though the plaintiff had failed to request leave to amend before dismissal). More relevant here is the rule that a complaint may be dismissed without leave to amend where the amendment would be futile. *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). For the reasons already discussed, Plaintiff's theory of fraud does not hold up under Michigan law. More detailed descriptions of the time and place the alleged statements were made would not cure its defects.

## C. Promissory Estoppel

Plaintiff's third claim invokes the doctrine of promissory estoppel. Under Michigan law, courts will enforce a clear and definite promise under this doctrine if the promisee or a third party reasonably relied on the promise and injustice can only be avoided by its enforcement. *State Bank of Standish v. Curry*, 500 N.W.2d 104, 107 (Mich. 1993) ("*Curry*") (citing the Restatement Second of Contracts, § 90.) As the Michigan Supreme Court explained, "the sine qua non of the theory of promissory estoppel is that the promise be clear and definite." *Id.* at 108; *see id*. at 109-10 (holding that evidence of the material terms of a promised loan was required to meet the clear and definite standard for promissory estoppel). The court additionally

emphasized that "the reliance interest protected by [promissory estoppel] is *reasonable reliance*." *Id.* at 107 (emphasis in original).

Plaintiff alleges eleven "promises" made by Defendant. These "promises" are identical to the statements earlier alleged under the counts of fraud and negligent misrepresentation. They are also equally insufficient to make out a promissory estoppel claim under Michigan law.

The alleged promises about Defendant's investment principles, his intentions to perform with integrity, and the operation of the Performance Fee do not meet the "clear and definite" standard necessary for liability on a promissory estoppel theory. The Michigan Supreme Court adopted the Restatement definition of a promise as "a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." *Curry*, 500 N.W.2d at 108 (quoting Restatement (Second) of Contracts § 2). The statements about "strictly adher[ing] to [] stated long-term investment principles" or maintaining "an unwavering focus on long-term intrinsic value" express an investment philosophy but do not make a clear and definite commitment to make any particular investment decision in a certain way. Similarly, Defendant's "promises" that he would act with loyalty and scrupulous honesty describe his intention to perform conscientiously, but again make no clear and definite commitment to take or refrain from taking any particular action. The statements regarding the Performance Fee also fail under promissory estoppel standards because the statements do not amount to promises but are merely descriptions of the incentive structure flowing from the Performance Fee.

The alleged promises regarding the time horizon applicable to investments made in 2007 and 2008 may at first appear somewhat more definite, but they too fall short of the standard adopted by the Michigan Supreme Court. Taking the statements first as alleged in the complaint,

a representation that "a 5 year time horizon" or "a 3-5 year time horizon" "applie[s]" to investments made in 2007 and 2008, respectively, stops well short of committing to act in a certain way, *i.e.*, to hold the securities purchased in those years for a definite amount of time. The complaint makes clear that these representations were drawn from the 2007 and 2008 Dear Partner Letters, so we may also look directly to those letters. In context, it is even more clear that the references to time horizons of three or five years were not commitments to act in a certain way, but rather further description of Defendant's investment opinions. The 2007 letter stated "[w]e do not focus on our month-to-month- or quarter-to-quarter results" but instead "we look to preserve and compound our capital over a five-year time horizon." (R. 1-1, Complaint, at 14-15 (quoting January 2007 Letter)). Similarly, the 2008 letter asserted a belief "that at today's market prices each [of the Partnership's] holding…has the potential for significant capital appreciation over the next three-to five years." (R. 1-1 at 15 (quoting January 2008 Letter)). These statements simply do not constitute promises, much less clear and definite ones.

The only remaining alleged promise is the statement summarizing the provisions of the Limited Partnership Agreement with regard to dissolution. While the statement qualifies as a clear and definite promise, it cannot be the basis for a promissory estoppel claim because the pertinent terms were set out in binding fashion in the Limited Partnership Agreement. The Michigan Supreme Court has held that a party may not premise a promissory estoppel claim on pre-contractual representations where the parties reduce their agreement to a written contract. *N. Warehousing, Inc. v State, Dept. of Educ.*, 714 N.W.2d 287 (2006). *See also Novack v. Nationwide Mut. Ins. Co.*, 599 N.W.2d 546, 552 (Mich. Ct. App. 1999) (holding that plaintiff could not have reasonably relied on an oral representation that the at-will provision of his employment contract did not apply to him when he entered into the contract that expressly

contradicted the oral representations). We have applied the same rule in a case governed by Michigan law to reject a promissory estoppel claim where the parties entered into a written contract. *Gen. Aviation, Inc. v. Cessna Aircraft Co.*, 915 F.2d 1038, 1042 (6th Cir. 1990). Although Michigan courts appear not to have confronted a case where a party alleged a promissory estoppel claim on statements that were substantially the same as provisions in a written contract, we doubt it would allow such an end-run around contract law requirements, including the applicable statute of limitations. "Promissory estoppel is not a doctrine designed to give a party to a negotiated commercial bargain a second bite at the apple in the event it fails to prove," or to timely bring a claim for, "breach of contract." *Id*. at 1042 (quoting *Walker v. KFC Corp.*, 728 F.2d 1215, 1220 (9th Cir. 1984)).

## D. Unjust Enrichment Claim

The final claim asserted in the complaint is unjust enrichment. The elements of an unjust enrichment claim are "(1) receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant." *Barber v. SMH (US), Inc.*, 509 N.W.2d 791, 796 (Mich. Ct. App. 1993) (citing *Dumas v. Auto Club Ins. Ass'n*, 473 N.W.2d 652, 663 (Mich. 1991)). Here, too, Plaintiff's efforts to find a viable theory of liability are unavailing.

The complaint asserts that Defendant was unjustly enriched when he took "substantial profits in the form of management fees paid to Blavin & Company and the Performance Fees paid to Preservation of Capital Management." (R. 1-1 at 35.) Plaintiff's theory of inequity is that Defendant "would never have received the substantial profits attributable to DBI's investments" but for his misrepresentations, and that Defendant has been "unjustly enriched

because [he] did not perform in accordance with the long-term investment principles of PWB Value Partners" or the other statements discussed above "but kept fees anyway." (*Id.* at 35-36.)

The district court held that Plaintiff cannot succeed on this claim due to the Limited Partnership Agreement, citing the rule that "[w]here an express contract to which plaintiff was a signatory governs the premise of the alleged unjust enrichment, like promissory estoppel, [the complaint] is subject to dismissal for failure to state a claim." *DBI Investments, LLC v. Blavin*, No. 13-CV-13259, 2014 WL 902866, at *6 (E.D. Mich. Mar. 7, 2014) (citing *Martin v. E. Lansing Sch. Dist.*, 483 N.W2d 656, 661 (Mich. Ct. App. 1992) and *Convergent Grp. Corp. v. Cnty. of Kent*, 266 F. Supp. 2d 647, 661 (W.D. Mich. 2003)). The Michigan Court of Appeals has routinely held that "a contract will be implied only if there is no express contract covering the same subject matter." *Barber*, 509 N.W.2d at 796; *see also Martin*, 483 N.W.2d at 661 (same); *Campbell v. City of Troy*, 202 N.W.2d 547, 549 (Mich. Ct. App. 1972) (same). Contrary to Plaintiff's assertions, this rule governs even where the party alleged to be unjustly enriched is a third party to the contract. *See Sullivan v. Detroit, Ypsilanti & Ann Arbor Ry.*, 98 N.W. 756, 758 (Mich. 1904) ("If A. makes an express contract with B. to perform services for C., C. is not liable on an implied contract because he received the benefit. The two contracts cannot exist together, governing the same transaction.").

Even if the existence of the Limited Partnership Agreement were not an obstacle to liability, Plaintiff's claim must fail because Defendant's retention of his portion of the fees earned by his investment companies is not unjust to Plaintiff. Plaintiff entered into a partnership agreement that provided an annual management fee to Blavin & Company for its labor in managing the partnership's investments to be supplemented by a performance fee to Preservation of Capital Management. Defendant did not profit from the Performance Fee in any instance in

which Plaintiff did not also profit from its investments. Thus, any fees paid to Defendant's companies, and any portion of those fees that were paid to Defendant personally, were either compensation for labor performed or a reward for successful performance. This is the arrangement Plaintiff agreed to and willingly participated in over the course of fourteen years. Plaintiff is in no way harmed by Defendant's retention of the profits he earned over that time. *See Barber*, 509 N.W.2d at 796.

## CONCLUSION

The complaint fails to state a claim as a matter of law. The judgment of the district court is **AFFIRMED.**